UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER 10-0226** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **LARRY D. KELLY** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 31] filed by defendant Larry D. Kelly.  For reasons stated below, it is recommended that the motion be **DENIED.**

On January 5, 2010, Corporals Timothy Antley and Eldridge Mahoney of the Monroe Police Department stopped Larry D. Kelly for a bicycle traffic violation at the intersection of Marx and McGee Streets in Monroe, Louisiana.  In the aftermath of the stop and pursuant to Kelly's arrest, the Monroe Police Department uncovered a crack pipe; a loaded .38 caliber pistol manufactured by Rossi U.S.A., S.A. (and imported by Interarms); a spent .38 cartridge; and two .22 cartridges.  After being advised of his *Miranda* rights, Kelly admitted to the arresting officers that he had been convicted of a prior offense.

On July 29, 2010, a federal grand jury returned a one count indictment against Larry D. Kelly for felon in possession of a firearm and ammunition, to wit:  a Rossi, 38 caliber revolver, loaded with four rounds of .38 caliber ammunition; plus two rounds of .22 caliber ammunition, all in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and 924(e) 26 U.S.C. § 5861(d) & (f).  The indictment also seeks forfeiture of the foregoing firearm and ammunition.  On February 11, 2011, Kelly, via counsel, filed the instant motion to suppress any evidence or testimony sought to

be used by the government in this matter. Following a delay for briefing and an evidentiary hearing that was held on March 8, 2011, the matter is now before the court.[1]

## Background

The following facts were established via the testimony and evidence presented at the March 8, 2011, hearing held in this matter.[2]

Corporal Antley has been employed as a police officer since August 1998. He attended the North Delta Regional Training Academy for police officers. Since October 2000, Antley has been assigned to the Special Neighborhood Action Program ("SNAP") Team, which is a proactive team that focuses upon narcotics, prostitution, and the like. The SNAP Team patrols high crime areas in the City of Monroe.

Corporal Mahoney is an eight year veteran of the Monroe Police Department. In January 2010, he had recently joined the SNAP Team.

On January 5, 2010, at approximately 3:30 p.m., Corporals Antley and Mahoney were on patrol south of Winnsboro Road, Monroe, Louisiana, in a single, marked, Monroe Police Department Crown Victoria, in a high crime area. The officers were wearing their regular, black SNAP uniforms or "BDUs,"[3] with ballistic vests that said "POLICE" on the back, and badges.

While southbound on Marx Street, Corporal Antley observed someone (later identified as

---

[1] The government filed a post-hearing brief on March 10, 2011. [doc. # 39].

[2] One of the exhibits introduced into evidence was an 18 minute-long, contemporaneous audio recording of the traffic stop captured by a microphone attached to Corporal Antley's waist. (Gov.'t Exh. 3). Antley activated the microphone "from the point that [he] could turn it on during contact with Mr. Kelly." The microphone recorded sounds and conversations in Antley's immediate vicinity, but is largely inaudible because of background noise. However, to the extent that there is an irreconcilable conflict between the testimony of the witnesses at the hearing and the contemporaneous audio recording, the court credits the recording.

[3] Battle Dress Uniform.

Larry Kelly) riding a bicycle (later identified as a 26" purple Murray Mystic), possibly on Reed Street, which is perpendicular to Marx Street and parallel to, and south of McGee Street. At that point, Kelly did not "stick out" in Antley's mind. There also were other people in the area, but no one attracted Antley's attention. Antley did not observe anyone engaged in criminal conduct. Mahoney did not recall seeing Kelly prior to the traffic violation that precipitated the stop. *See* discussion, *infra*.

Shortly thereafter, Antley and Mahoney "made the block," and looped around to proceed north on Marx Street, in the course of their routine patrol.[4] They then encountered Larry Kelly on his bicycle, who also was proceeding northbound on Marx. The officers slowed down to match Kelly's speed, which was perhaps less than ten miles per hour. According to Antley, he remained two to three car lengths behind Kelly to see what Kelly intended to do before he overtook him. Antley explained that bicyclists turn all the time in front of them.

A few moments later, Kelly validated Antley's concern, by turning left, or west, onto McGee Street, without employing a hand signal. Upon observing this traffic infraction, Antley and Mahoney turned onto McGee Street, and honked the car horn to signal Kelly to stop and pull over. Kelly so complied.

Antley and Mahoney briefly spoke to Kelly. Kelly was wearing a brown fanny pack around his waist, and appeared nervous. Antley told Kelly why they stopped him, and asked him who he was. Kelly identified himself as Larry Johnson. His speech pattern, however, was evasive; he did not seem comfortable speaking with the officers. Kelly was hesitant, and appeared to be concealing his identity. In Antley's experience, individuals who are not doing anything wrong or breaking any laws remain relaxed and very calm during questioning. While

---

[4] Antley testified that they did not purposely "make the block" to intercept Kelly.

the officers were speaking to Kelly, he was straddling his bicycle, with his hands on the handlebars. Because of the way he was acting, Antley felt that it was necessary to check Kelly for weapons. Antley told Kelly that he needed him to step off of his bicycle, and inquired whether he had any guns, knives, or weapons. Antley asked Kelly to step over to the police vehicle and to place his hands on the vehicle so he could pat Kelly down for weapons. However, *before* the officers could pat Kelly down, he fled on foot

Antley admitted that he did not observe anything on Kelly's person or within his immediate reach that could have been a weapon. Mahoney conceded that Kelly did not make any aggressive motions towards them or make any verbal threats. However, Kelly had a fanny pack and four layers of clothes on.

The audio recording from Corporal Antley's microphone suggests that 23 seconds into the recording, Antley asked Kelly his age. Kelly's response was inaudible, but Antley then inquired "27?"[5] At 31 seconds, Antley asked Kelly, "that house you just left there, who do you know there?" Kelly replied that it was his "grandpa's house." At 57 seconds, Antley asked Kelly "why is everybody outside the house for?" At 1:15, Antley inquired whether Kelly had any firearms on him. At 1:30, Antley told Kelly to "step off the bike and talk to me for a second," followed by "I don't want to go hardcore on you, alright . . ." and at 1:44 with "you didn't signal on your turn." At 1:54, Antley asked Kelly whether he had a gun. The excited utterances on the recording suggest that Kelly took to flight at 1:55.

Antley testified that Kelly did not run far before the officers stopped him. Kelly stumbled upon reaching a shallow ditch on the other side of the road, and Antley pushed Kelly to the ground to arrest his flight. Antley and Mahoney tried, in vain, to gain control of Kelly. They

---

[5] Kelly actually was 46 years old at the time.

4

gave him verbal commands to cease his resistance and to place his hands behind his back. During this period, Kelly was hollering presumably in an effort to secure the assistance of any passersby.[6] Antley and Mahoney were unable to secure Kelly's right arm behind his back. Kelly continued to struggle and actively resisted the officers' efforts to handcuff him. Accordingly, Antley deployed his X-26 Taser, which had minimal effect on Kelly – likely because one of the prongs struck Kelly's leather belt.[7] Antley again used the taser on Kelly in the drive-stun configuration, wherein the contact probes on the front of the taser are applied directly to the suspect's back area, but it too had little effect. Antley attempted to force Kelly's compliance by using his knee to strike Kelly several times. This technique also proved ineffective.

A few minutes into the struggle, Antley and Mahoney called for reinforcements, and restrained Kelly in the ditch until officers Kent and Baker arrived on scene.[8] The recording suggests that the backup officers arrived 9:15 after the recording began.

After the backup officers arrived, they handcuffed and escorted Kelly to the patrol car where they searched him incident to arrest. The search uncovered a crack pipe; a loaded .38 caliber pistol in Kelly's front, right pants pocket; a spent .38 cartridge; and two .22 caliber rounds in Kelly's fanny pack. The recording indicates that they uncovered the gun at the 11:30 mark.

Once Antley recovered from the encounter and gathered the evidence, he advised Kelly of his *Miranda* rights, which Kelly appeared to understand. The officers did not learn Kelly's true identity until some time later. Antley believed that Kelly admitted that he had been convicted of a prior offense. According to the incident report, Kelly stated that he had been convicted of

---

[6] This can be heard on the recording at approximately the three minute mark.

[7] A taser-like sound can be heard on the recording at 3:39.

[8] Specifically, they kept Kelly's right arm pinned beneath him where he could not move it to hurt the officers.

5

burglary within the last ten years. *See* Incident Report; Gov.'t Exh. 4.

Antley arrested Kelly on charges of 1) Improper Turn; La. R.S. 32:104(B); 2) Illegal Carrying of a Concealed Weapon; La. R.S. 14:95(A)(1); 3) Illegal Carrying of a Weapon by a Convicted Felon; La. R.S. 14:95.1 4) Possession of Drug Paraphernalia; La. R.S. 40:1033; 5) Resisting an Officer by Violence, La. R.S. 14:108(B)(1)(A); and 6) Resisting an Officer by Refusing Identity, La. R.S. 14:108(B)(1)(C). (Aff. Of Prob. Cause to Arrest; Gov.'t Exh. 4).

Corporal Antley issued Kelly a traffic citation for Improper Turn, a violation of Louisiana Revised Statute 32:104(B). (Citation; Gov.'t Exh. 2). Kelly did not sign the citation because he was arrested.

Antley and Mahoney have stopped other bicyclists for traffic violations. Pursuant to a traffic stop, an officer has discretion to arrest the offender or to issue a citation. Kelly fled before Antley could verify his identity and before he could issue a citation.

Antley testified that there had been numerous narcotics investigations in and around the area where the stop occurred. The drug traffic primarily involves marijuana and crack cocaine. Several search warrants have uncovered drugs just down the street from the intersection where the officers stopped Kelly.

## Law and Analysis

**I.     The Stop and Detention**

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks omitted). A traffic stop entails a seizure for purposes of the Fourth Amendment. *Id.*; *see also, United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and

6

detaining its occupant(s) constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

      a)    <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). In the context of a traffic stop, *Terry*'s first condition is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, \_\_ U.S. \_\_, 129 S.Ct. 781, 784 (2009).

In Louisiana, "a bicycle rider is subject to the same traffic laws as is a driver of a motor vehicle." *Gladney v. Cutrer*, 440 So.2d 938, 939 (La. App. 2d Cir. 1983) (citation omitted); *see also* La. R.S. 32:194 ("Every person riding a bicycle upon a highway of this state . . . shall be subject to all the duties applicable to the driver of a vehicle by this Chapter . . ."); *Harris v. City of Shreveport*, 69 Fed. Appx. 657, *2 (5th Cir. May 19, 2003) (unpubl.) (citing La. R.S. 32:194 and remarking that bicycles are subject to Louisiana traffic laws). Furthermore, whenever someone intends to make a left turn, he is required to signal his intention "during not less than the last one hundred (100) feet" before turning. La. R.S. 32:104(B). A turn signal shall be given by means of the hand and arm or signal lamp. La. R.S. 32:105(A); *see also*, La. R.S. 32:106 (describing manual turn signals).

In this case, the uncontroverted evidence, corroborated by both testifying officers, establishes that Kelly executed a left turn on his bicycle without signaling his intention to turn. Kelly's failure to signal his turn provided the officers with reasonable suspicion to stop him for a traffic violation.[9]

---

[9] The court notes that the questions that the officers asked Kelly on the audio recording suggest that they were interested in activity occurring at a nearby house. Nevertheless, even if an officer has an ulterior motive for the stop, such motive does not render the stop unconstitutional. *See United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003) ("the constitutional

The instant four-sentence motion to suppress focused solely upon the legality of the initial stop. Having determined that the stop was supported by reasonable suspicion, the inquiry is technically at an end. For the sake of completeness, and although un-argued, and therefore not contested, the undersigned will proceed with the remaining steps of the *Terry* analysis.

      b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions. *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson, supra*. The temporary seizure that occurs during a traffic stop remains reasonable for the duration of the stop, which

---

reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."). The officers' failure to disclose this motive at the hearing does not undermine their credibility. As the officers testified, bicyclists frequently fail to follow traffic rules.

normally extends until the police have no further need to control the scene and inform the vehicle operator that he is free to leave. *Id*.

Here, Officer Antley questioned Kelly but for a few minutes before asking him to dismount his bicycle and to step over to the police cruiser.[10] During this period, Antley did not say anything to Kelly to convey to him that the traffic stop had ended or that he otherwise was free to leave. *See Johnson, supra*. Indeed, Antley had yet to run a background check or to issue a citation. Nonetheless, Kelly attempted to flee *before* Antley could pat him down.[11] The

---

[10] Although the same concerns for officer safety that per se authorizes a police officer to ask a car occupant to exit the vehicle during a traffic stop appear to be absent in the situation of a bicyclist who remains in full view of the officer, the countervailing, and already limited, liberty and privacy interests enjoyed by a motor vehicle occupant are not shared by an exposed bicyclist. *Compare Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333 (1977) (holding that once a motor vehicle has been lawfully detained for a traffic violation, the stopping officer may order the driver to get out of the vehicle without violating the Fourth Amendment).

[11] To the extent that the lawfulness of the threatened, but un-executed pat down is material to Kelly's decision to flee, the court observes that before an officer may take the additional step of patting down or frisking a vehicle operator during a traffic stop, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 129 S.Ct. at 784. This is because a frisk is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly. *Terry*, 392 U.S. at 17, 88 S.Ct. at 1877. Thus, an officer cannot conduct a pat down or frisk as a matter of course. *United States v. Jones*, 2009 WL 736197 (S.D. Miss. Mar. 18, 2009) (Starrett, J.); *United States v. Rideau*, 969 F.2d 1572, 1576 (5th Cir. 1992) (en banc) (lawful detention is not a license to frisk). Conversely, he also need not be absolutely certain that the detainee is armed; rather, "the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (citation omitted).

At the hearing herein, Antley testified that his suspicions were heightened by the evasiveness of Kelly's answers and his demeanor. In response to additional questioning, Antley and Mahoney explained that the stop occurred in a high crime area (albeit, in the afternoon), that Kelly displayed a fanny pack around his waist, and wore four layers of clothes (albeit, he was riding a bicycle in the middle of winter). On the other hand, the court notes that the officers outnumbered the sole suspect, who was straddling a bicycle, with both hands grasping the handlebars. Although these considerations individually do not support a reasonable suspicion that Kelly was armed and dangerous, in combination, they provide an objective basis to support a limited frisk or pat down. *See e.g., United States v. Huerta*, 252 Fed. Appx. 694, 696 (5th Cir. Oct. 31, 2007) (unpubl.) (officer had reasonable suspicion to support pat-down during a traffic

Supreme Court has remarked that

> [h]eadlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such . . . Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Wardlow, supra*.

Further, "[w]hile flight from a law enforcement officer cannot support alone a determination of probable cause, flight can provide in appropriate circumstances the key ingredient justifying the decision of a law enforcement officer to take action." *United States v. Vasquez*, 534 F.2d 1142, 1146 (5th Cir. 1976).

## II.    The Search

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991). One such exception is a search incident to arrest. A full search of the person pursuant to a lawful custodial arrest is both reasonable, and an exception to the warrant requirement under the Fourth Amendment. *Lockett v. New Orleans City*, 607 F.3d 992, 1001 (5th Cir.), *cert. denied*, ___ U.S. ___

---

stop where he was suspicious of defendant's answers to questioning and the defendant immediately approached the officer after being stopped); *United States v. Reyes*, 349 F.3d 219, 224-5 (5th Cir. 2003) (officer had reasonable belief that suspect might be armed and dangerous where the suspect was wearing a large jacket that might conceal a weapon, the officer was outnumbered, and his dog had alerted to the presence of narcotics); *United States v. Ledet*, 385 Fed. Appx. 392 (5th Cir. July 13, 2010) (unpubl.), *cert. denied*, ___ U.S. ___, 131 S.Ct. 618 (2010) ("appeared" to officer that defendant was concealing something).

‗, 131 S.Ct. 507 (2010) (citing *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973)).

Once the officers succeeded in subduing Kelly, they searched him incident to arrest and uncovered the firearm and ammunition. Further, Officer Antley's decision to arrest Kelly for the traffic infraction was supported by probable cause. *See* La. Code Crim. P. Art. 213 (authorizing arrest for a misdemeanor committed in officer's presence and upon close pursuit); *United States v. Kye Soo Lee*, 962 F.2d 430, 436 (5th Cir. 1992) (recognizing right to warrantless arrests for traffic misdemeanor offenses in Louisiana); *State v. Sherman*, 931 So.2d 286, 291 (La. 2006) (officers had probable cause to make a custodial arrest for traffic violation); *see also, Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001) ("an officer [who] has probable cause to believe that an individual has committed even a very minor criminal offense in his presence . . . may, without violating the Fourth Amendment, arrest the offender").[12]

### III. Admissibility of Incriminating Statement

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by

---

[12] Because of the court's resolution of the several issues herein, the court need not resolve whether Kelly's attempted flight constituted an independent basis for his arrest. The undersigned observes, however, that the 2006 amendment to § 14:108 expanded the definition of resisting an officer to include resistance to lawful detention, but did not amend the definition of obstruction by flight to include an individual fleeing a lawful detention or frisk. *Compare* La. R.S. 14:108 ¶¶ A & B(1)(a) (as amended). Whether intentional or not, the 2006 amendment failed to criminalize flight to avoid detention or frisk. *See State v. Bullock*, 576 So.2d 453, 457 n4 (1991) ("flight alone is only a crime if the prerequisites of La. R.S. 14:108(B)(1)(a) have been met").

> law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted).

"[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted). The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986), *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619 (1972).

In this case, although unchallenged by defendant, the government seeks a determination regarding the admissibility of any statement or admission made by Kelly before or after his arrest. The sole relevant statement purportedly made by Kelly during this period was that he had been convicted of a prior offense. He apparently made this statement after having been advised of his *Miranda* rights. Kelly does not dispute that he made the statement or otherwise contend that his statement was involuntary or coerced. Moreover, this same evidence is likely obtainable from other independent and unimpeachable sources. Under these circumstances, the undersigned discerns no creditable basis to suppress the statement.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 31] filed by defendant

Larry D. Kelly be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)© and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 15th day of March 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE